28 C.C.P.A.(Patents)

## MERSHON v. ROBINSON.

### Patent Appeal No. 4450.

Court of Customs and Patent Appeals.

June 30, 1941.

Rehearing Denied Oct. 6, 1941.

Cooper, Kerr & Dunham, of New York City (Edwin R. Hutchinson, of Washington, D. C., and H. Frank Wiegand and Robert S. Dunham, both of New York City, of counsel), for appellant.

Dorsey, Cole & Garner, of Washington, D. C. (Vernon M. Dorsey, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal by the party Mershon in an interference proceeding which arose in the United States Patent Office. The appeal is from the decision of the Board of Appeals affirming that of the Examiner of Interferences awarding priority to the party Robinson.

The subject matter is that of a process for forming electrolytic condensers, to be used, as we understand it, in radio receiving sets. Two counts are involved which read:

"1. In the manufacture of electrolytic condensers comprising an aluminum electrode and an aqueous electrolyte comprising a weak acid and a salt of a weak acid, the process which comprises the addition to the electrolyte of a gelatinous precipitate of aluminum-hydroxide, prior to the assembly of the electrolytic device.

"2. The method of forming and operating electrolytic condensers having aluminum anodes to obtain a low power factor, comprising immersing the anodes in a film-forming electrolyte of a weak acid and a salt of a weak acid containing a substantial amount of colloidal aluminum hydroxide, forming films on the anodes while so immersed, and thereafter using the anodes in a condenser having an electrolyte of a weak acid and a salt of a weak acid containing a

496

substantial amount of colloidal aluminum hydroxide."

The controversy arose between co-pending applications. The application of Robinson was filed July 16, 1930, and that of Mershon December 6, 1930. The interference was declared September 18, 1933. Mershon being the junior party, it was incumbent upon him to prove his case by a preponderance of the evidence, and testimony was taken on his behalf. No testimony was taken on behalf of Robinson. Therefore, he is confined to the filing date of his application for both conception and reduction to practice.

It will be noted that there are differences between the involved counts, and certain of these differences are referred to in the briefs on behalf of both parties.

Obviously, the subject matter is of a highly technical character and both counts are broad in their terms. Count 2 contains the phrase "to obtain a low power factor," and we deduce from the record that this functional statement explains the result which was sought, but the record contains no distinct definition of "low power factor," so far as we have been able to determine.

In a decision rendered by the Examiner of Interferences during interlocutory proceedings (not here involved) it was said: "The inventions of both parties relate to electrolytic condensers employing filmed aluminum electrodes. Such condensers comprise a casing which serves as one electrode, a liquid electrolyte, and one or more filmed aluminum plates which serve as the other electrode. The film is formed on the aluminum electrode by an independent electrolytic process old in the art, and has the property when formed of offering high resistance to the flow of current when the electrode is used as the anode or positive electrode of an electrolytic device, but freely passing current when the electrode is used as the cathode of such device. Both parties have found that the resistance, and accordingly the power factor, of such devices varies with age; possibly due to the gradual dissolving of the film in the electrolyte with non-use of the device. The specific invention of both parties relates to a means to prevent this variation. This means comprises, in its simplest aspect, the addition of colloidal aluminum hydroxide to the electrolyte of the finished device. It is alleged, however, that better results are obtained if the colloidal aluminum hydroxide is also added to the electrolyte in which the films are formed prior to the film forming process. In this case the same electrolyte which was used to form the film may also be used as the electrolyte in the finished condenser, and if desired the finished condenser may be assembled with unfilmed electrodes and the colloidal aluminum hydroxide electrolyte and then put through the film forming process. In this latter case the condenser is complete as soon as the film forming process is finished. In any of these cases, however, the novelty resides in the addition of the colloidal aluminum hydroxide to the electrolyte, either in the finished condenser, or in both the finished condenser and film forming process. The basic electrolyte of both parties comprises a dilute solution of boric acid and borax."

The foregoing, while referring to "power factor," does not indicate any standard for determining what a "low power factor" is.

Mershon's specification, after stating alternative methods for forming condenser films and naming his preferred method, states: "In either case the effect of the colloidal material upon the power factor of the condenser is pronounced, giving a consistently lower value than is obtainable without such material, and moreover these lower values are substantially constant. For example a condenser in continuous operation for more than three thousand hours still shows a power factor of 4.3 per cent. Other condensers, with electrolytes containing less of the colloid, show power factors between 5 and 6 per cent."

That statement might be construed to indicate that, in Mershon's opinion at the time of filing his application, a "low power factor," expressed in percentage terms, would be a power less than 5 per cent, but the brief on his behalf before us states that "power factors between 5 and 6 per cent are low power factors and that power factors as low as 4.3 per cent are extraordinarily low power factors."

Reference has been made by us to the "low power factor" feature expressed in count 2 for the reason that, as we understand the case, that factor is important in passing upon the question of Mershon's conception and reduction to practice of that count. That is to say, he may not be awarded priority as to that count unless he has shown, by a preponderance of the evidence, conception and reduction to practice (or conception with diligence thereafter during the critical period), prior to Robinson's filing date, of an electrolytic con-

denser, by using the materials described in the counts, which electrolytic condenser had a "low power factor."

We revert briefly to the distinction between the counts. Count 2 contains the phrase "and operating," which is not present in count 1, but this is conceded to be inconsequential here. Count 1 does not contain the functional statement, "to obtain a low power factor," but, as the issues are here presented, that difference requires no discussion. Another distinction is that count 1 requires the addition of a gelatinous precipitate of aluminum-hydroxide to the electrolyte prior to the assembly of the electrolytic device, while count 2, apparently, would be satisfied by the mere presence of colloidal aluminum hydroxide (it being conceded that "colloidal" means the same thing, so far as this case is concerned, as the "gelatinous precipitate" mentioned in the first count) in the electrolyte at the time of the latter's formation. In other words, count 2 would be met by the formation of hydroxide during the process of making the electrolyte, while count 1 requires that the hydroxide be added before the process begins.

It is readily discernible, we think, that there might be conception and reduction to practice of count 2, which would not apply to count 1, but it might be questioned whether the converse is true. However this may be, there is no claim on behalf of Mershon that he is entitled to an award of priority as to count 1 unless it be found that he is entitled to such an award as to count 2, which latter count he, following the example of the Examiner of Interferences, takes as typical.

Our discussion, therefore, may be confined to count 2.

The evidence on Mershon's behalf consists of the testimony of himself and a party by the name of Ross, who was in charge of Mershon's laboratory and conducted the various tests hereinafter referred to appertaining to the process, together with numerous exhibits such as notes made by Ross concerning the tests and notations of Mershon giving different suggestions, instructions, and expressions of opinion.

The decision of the Examiner of Interferences upon the merits contains the following descriptive statement: "The subject matter of this interference relates to the method of forming electrolytic condensers. The electrolytic condenser in issue consists of aluminum anodes immersed in an electrolyte consisting of an aqueous solution of a weak acid and a salt of a weak acid (boric acid and borax in the present instance). The films are formed on the anodes by immersion in the electrolyte to which a substantial amount of aluminum hydroxide has been added. After the films have been formed the anodes are used in an electrolyte of the same type, namely, a solution of a weak acid and a salt of a weak acid containing a substantial amount of aluminum hydroxide."

After making this statement the Examiner of Interferences proceeded to an elaborate analysis of the evidence relating to various tests which were made by Ross under Mershon's authority in the latter's laboratory in New York and concluded that Mershon had failed to establish either conception or reduction to practice prior to the filing date of the Robinson application.

The board gave no description of the invention aside from quoting the counts, nor did it state the testimony elaborately, but references were made by it to such parts of the evidence as, we assume, it deemed pertinent to a determination of the facts.

The Examiner of Interferences who passed upon the merits of the case said: "The facts adduced by the testimony taken in behalf of Mershon are not disputed by the parties to any great extent. The main controversy resides in the law applicable to the facts set forth."

It appears that a different Examiner of Interferences passed upon the issues which were involved in the interlocutory proceedings where the interference was, upon Mershon's motion, dissolved as to a count which is not involved here, and it is contended on behalf of Mershon, in substance, that the decision of the Examiner of Interferences in such interlocutory proceedings "established the law of the case in important respects," and that the decision of the Examiner of Interferences who passed upon the merits made "mistakes of law" which should have been, but were not, corrected by the board.

The meaning of this argument, as we understand it, is that the Examiner of Interferences who passed upon the merits failed correctly to apply the law to facts the establishment of which were not seriously disputed. Incidentally, it may be said that the decision in the interlocutory proceedings did not of necessity "establish the law of the case." It stated what the Examiner

of Interferences believed to be the law applicable to such issues as were involved there, and stated it correctly, so far as we are advised. That decision is not involved here. It had no relation to questions of evidence; no evidence had been taken at the time of its rendition. There was a refusal there to sustain Mershon's motion to dissolve as to the counts before us, and Mershon took no appeal to the board. No question is before us relating to the right of either party to make the counts now in the case, nor was any such question ever before the board. We must assume that the disclosures of both parties support the counts, and the issue before us may be stated in question form as follows:

Does the record establish by a preponderance of the evidence that Mershon, prior to July 16, 1930, conceived and reduced to practice (or conceived prior to that date and thereafter was diligent in reducing to practice) a process of forming and operating an electrolytic condenser having aluminum anodes which produced a low power factor by practicing the three steps embraced in count 2; viz. "[1] immersing the anodes in a film-forming electrolyte of a weak acid and a salt of a weak acid containing a substantial amount of colloidal aluminum hydroxide, [2] forming films on the anodes while so immersed, and [3] thereafter using the anodes in a condenser having an electrolyte of a weak acid and a salt of a weak acid containing a substantial amount of colloidal aluminum hydroxide."

Obviously, this question is one of fact.

As has been indicated, the record discloses a series of tests conducted by Ross at the instigation of Mershon, different condensers being used. These tests took place during a considerable period. The first activity noted (and it has no direct bearing upon the issue) began in January, 1928. The various tests which followed that activity began on different dates ranging from April 12, 1928, to May 27, 1930. They continued for different periods, some being discontinued after only a comparatively few hours operation. Others were conducted for longer times, some of them not being discontinued until after Robinson's filing date of July 16, 1930. Each of the tests is specifically described in the decision of the Examiner of Interferences, the object of each being stated together with the materials used, so far as

such materials were shown, and the results obtained. None of the statements of the Examiner of Interferences relative to the facts shown by the tests are questioned here, the contention being that a wrong conclusion was drawn from such facts, and it would unnecessarily lengthen this opinion to restate the findings of fact in detail. Such as are essential to an understanding of our decision will appear later.

After the Examiner of Interferences had analyzed the tests, he stated: "On the above described tests the party Mershon rests his case, contending specifically that each of the tests on condensers 53, 65, and 83 constitutes reduction to practice prior to the record date of the party Robinson."

Before us Mershon, while not formally abandoning the tests carried out on condensers 53 and 65 (nor in fact any of the other tests) relies primarily upon that carried out on condenser 83, identified in the record as "Special Test 139."

That test, together with its relation to certain subsequent tests, is described in the decision of the Examiner of Interferences as follows:

"On February 15, 1929, 'Special Test 139' was started. The object of this test was to determine whether an electrolyte could be treated by passing current between two aluminum anodes reversing the current when necessary. At the conclusion of this test the electrolyte was found to be opaque with aluminum hydroxide.

"On February 19, 1929 the treated electrolyte taken from 'Special Test 139' was used in condenser 83. This condenser showed a low power factor dropping as low as 3.74 after 1,023 hours of operation. After 1,500 hours of operation the power factor began to slowly rise and after 3,998 hours of operation had reached 5.23. The test was discontinued on January 12, 1931 after 4,095 hours of operation.

"At this time it was believed that the aluminum hydroxide might have the effect of producing the low power factor. To check this theory a test was run in which the electrolyte was treated as had been that in condenser 53 and subsequent treated electrolytes except that a copper tank was used rather than aluminum. This test was started on March 19, 1930. After treatment of the electrolyte the nickel cathode was found to be copper plated indicating that in the set ups used by Ross to treat the electrolyte there was a stray current

flow between the tank and electrolyte which would cause some of the material of the tank to be present in the electrolyte.

"This electrolyte was tested in condenser 84. The test however was discontinued after only 230 hours of operation since although the power factor was decreasing it was not falling rapidly enough to warrant further continuance of the test.

"On May 27, 1930 a test on condenser 89 was started. The object of this test was to determine whether a high film stress condenser would give constant K. V. A. if operated in an electrolyte containing aluminum hydroxide. The electrolyte for this condenser was treated by the procedure of 'Special Test 139.' This test was discontinued on September 16, 1930 after 1,317 hours of operation. The last power factor computed by Ross was 10.48 on September 13, 1930. This test never gave the lower power factors that were obtained on the low film stress condensers, the lowest recorded being 9.45."

It will be observed from the foregoing that the test with condenser 83 was not discontinued until January 12, 1931. This was about six months after Robinson's filing date and a little more than a month after the filing date of Mershon. Also, it will be observed that the test on condenser 89, which began less than two months before Robinson's filing date, in which the electrolyte was treated by the procedure of the test on condenser 83, was discontinued September 16, 1930, after 1,317 hours of operation, the discontinuance being just two months after Robinson's filing date and the power factor, computed two days before its discontinuance, being 10.48.

■ It will be borne in mind that so far as reduction to practice is concerned Mershon may not receive credit for anything accomplished by tests conducted in whole or in part after Robinson's filing date (unless, of course, he has shown prior conception coupled with due diligence) but it may be remarked that we fail to find any accomplishments in tests even after that date which would seem to meet the counts. We take it that a power factor of 10.48 is not a low power factor as understood by those skilled in the art, and since the electrolyte used in the test, in which that factor resulted, was treated by the same procedure as the electrolyte in the test, upon which Mershon here relies, it would seem to bring in serious question, so far as suc-

cessful reduction to practice is concerned, the certainty of the results claimed for the test on condenser 83.

We deem it not improper to say that in addition to the uncertainty under which we labor relative to the meaning of the term "low power factor," another troublesome element confronts us in that there is no satisfactory showing as to the length of time a device such as that here involved should, or must, be successfully operated in order to constitute reduction to practice. Under some circumstances this undoubtedly would be a matter of importance in reaching a correct conclusion. However, it does not appear to have entered into the consideration which led the tribunals of the Patent Office to the conclusion which they concurred in, and we need not dwell upon it.

■ We think the Examiner of Interferences either set forth literally, or paraphrased with entire fairness, the material evidence essential to a proper determination of this case. We have given due consideration to the arguments of counsel for Mershon and to the excerpts from the evidence quoted in their brief, but we agree with the conclusion reached below to the effect that Mershon has failed to show by any satisfactory evidence that there was ever, prior to Robinson's filing date, any test made by or for him in which aluminum hydroxide was used which properly may be regarded as constituting conception of the invention (as the term "conception" is well understood in patent law) here involved. In the absence of conception it follows, of course, that there could not have been a reduction to practice.

Our findings upon those questions being in conformity with the findings below and being negative in character, no useful purpose would be served by quoting the evidence or reviewing it here. Counsel for appellant had the opportunity (and during oral argument of the case before us were invited) to point out any affirmative evidence contradicting the negative findings below, but failed so to do. Arguments have been presented relative to the construction which should be placed upon some of the evidence, but those arguments are not convincing. They do not meet the requirement for affirmative evidence which, were any found, we would state. We can see no occasion for stating the arguments and pointing out what we conceive to be

their weaknesses. Proof of facts is the primary essential here and such proof is lacking.

The decisions of the respective tribunals of the Patent Office concur in all material findings of fact involved in the case and we are not convinced that they were in error.

The decision of the board is affirmed.

Affirmed.